MICRO CONSULTING, INC., Plaintiff,

v.

Pedro ZUBELDIA and Medical Electronic Data Exchange, Inc., Defendants.

No. CIV–88–1348–W.

United States District Court, W.D. Oklahoma.

Sept. 19, 1990.

Dr. George Hedrick—Special Master, Dept. Head, Computer Science Dept., Stillwater, OK, R. Lyle Clemens, Kandi Jepsen Pate, Clemens, Holshouser & Pate, Oklahoma City, OK, for plaintiff.

Thomas P. Goresen, Eric S. Gray, Roberts, Gray, Goresen & Moriarty, Oklahoma City, OK, for defendants.

LEE R. WEST, District Judge.[*]

This matter came on for trial[1] before the Court sitting without a jury on the claims of the plaintiff, Micro Consulting, Inc., against defendants Pedro Zubeldia and Medical Electronic Data Exchange, Inc., and on the counterclaim of defendant Zubeldia.[2] Having heard the testimony of the witnesses and the argument of counsel and having reviewed the parties' pre- and post-trial submissions and those exhibits admitted into evidence, the Court makes the following factual findings and draws the following legal conclusions therefrom. Rule 52, F.R.Civ.P.

## Findings of Fact

1. Plaintiff Micro Consulting, Inc. (Micro Consulting), is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. It was formed in 1982 by defendant Zubeldia together with Victor Schuelein and Bill Halpain, the principals of Schuelein and Halpain Engineering, Inc. (S & H), a company which supplies engineering services to the construction industry. The purpose of Micro Consulting was to market consulting services to architects and engineers in Oklahoma City. In connection with such services, it used a heating, ventilation and air conditioning computer program created by Zubeldia at S & H's request.

2. Zubeldia provided technical expertise necessary to perform the computer consulting services and Schuelein and Halpain, through S & H, provided and/or arranged for financing. Zubeldia was Micro Consulting's president, a member of its board of directors and its sole employee. He owned (and still has) forty percent (40%) of the company's stock. Schuelein and Halpain, then secretary/treasurer and vice president, respectively, each held (together with

1. Having determined that a complete presentation of the evidence was necessary to adjudicate the issues raised by the parties in their Motions for Summary Judgment, the Court deferred ruling on the motions. Since the matter has now been fully presented and argued, since the standards imposed by Rule 56, F.R.Civ.P., no longer apply and so that there will be no unresolved motions, the Court finds

   (a) the Motion to Strike Affidavit of Defendant Zubeldia filed by the plaintiff is moot;
   (b) the defendants' Motion for Summary Judgment on the First, Second and Third Causes of Action is denied; and

   (c) the plaintiff's Motion for Summary Judgment on Count 1 and for an Injunction is denied.
   The parties are advised that the arguments and authorities contained in these submissions were used by the Court in resolving the legal issues in this matter.

2. Defendant Medical Electronic Data Exchange, Inc., has advised the Court in its trial brief that it intends to dismiss its counterclaim for tortious interference with business and contractual relations. Accordingly, the Court has not considered the merits of this counterclaim and deems it dismissed.

their wives) thirty percent (30%) of the stock.

3. Demand for these consulting services declined and Micro Consulting, at Zubeldia's suggestion, decided to develop a consulting service for health care providers. To this end, Zubeldia created "Claimnet." It is a set of approximately 400 computer programs which processes insurance claims electronically for health care providers for submission to government programs, Medicare and Medicaid, for payment. It was initially developed in late 1982 and early 1983 by Zubeldia during the course, and in the scope, of his employment with Micro Consulting. The set of programs, which includes original as well as licensed programs and those in the public domain, was constantly being improved throughout Zubeldia's employment to meet the needs of clients and to conform to government regulations and rules.

4. Micro Consulting had difficulty generating sufficient revenue. It ventured into other areas such as the sale of computer hardware to its customers in Spain. It licensed certain of its technology to third parties but required these parties to execute nondisclosure agreements.

5. The parties also contemplated the idea of additional investors. A financial analysis was conducted and a business plan was prepared by a consultant at Zubeldia's direction in October 1987. The business plan indicated that Micro Consulting had an established value of $4,600,000.00. Schuelein testified at trial that a more realistic value at that time was $400,000.00 and both Schuelein and Halpain testified that the present value of the company, the principal asset of which is Claimnet, is no greater than $50,000.00. The decline in value is attributed to competition from other companies, primarily defendant Medical Electronic Data Exchange, Inc. (Medex), and to problems with Claimnet.

6. No investors were found and the parties differed in their opinions regarding Micro Consulting's operations and growth. Zubeldia expressed an interest in expanding Claimnet's capabilities and in developing software to process commercial insurance claims through National Electronic Information Corporation. Schuelein and Halpain wanted Micro Consulting to stabilize and become sufficiently profitable to repay its debts to S & H and other creditors before any significant expansion occurred. Certain loans were repaid during this time by Micro Consulting to S & H over Zubeldia's protests and as a result, the parties' business relationship began to deteriorate more rapidly.

7. Discussions ensued regarding Zubeldia's separation from the company. He resigned as president of Micro Consulting on March 22, 1988, and in his letter of resignation, he wrote:

"Since I do not believe the direction in which you want to take Micro Consulting is a viable approach for the long term success of the company, and you have expressed your dissatisfaction with my attempts to steer the company in that direction, I believe that it is in the best interest of the company and its majority stockholders for me to step down as President.

. . . .

As we discussed this morning, I would like to continue bringing my technical abilities to Micro Consulting, continuing the customer support and the new installations. I also want to train someone on the operation of the Claimnet System, and its internal workings, to insure the continuation of our efforts for the future.

. . . .

My plans for the future include an Electronic Claims Clearinghouse. As you know there are several in existence today, and none of them are offering the services that I want to offer. Therefore I believe there is room for one that will offer what the market demands. I will be working, as my time allows it, towards that goal.

In order to avoid a conflict with the programs in the Claimnet System, which I designed, developed, and maintain, we need to make one point very clear. As you know, the protection of the software is controversial. I could develop com-

pletely new software for a new clearinghouse without looking at the Claimnet source code, but since I designed the Claimnet algorithms, and wrote every single piece of code, it would be very likely that the result of the new effort would be almost identical to the Claimnet System. A better approach, I believe, is to have full access to the Claimnet source code so I can make sure that the new code does not use the same algorithms as Claimnet. This will be a more difficult approach, as the Claimnet algorithms are highly optimized, and I will have to resort to less than optimum algorithms, but at least it will guarantee that we do not get into a conflict over the ownership of the new system. If you do not like this approach, please let me know."

Plaintiff's Exhibit 17.

8. Zubeldia's employment ended on May 15, 1988. No documents were executed by the parties regarding the terms and conditions of his termination from employment. Zubeldia however was requested orally and in writing to return all Micro Consulting property including Claimnet software he possessed and a 1982 Honda vehicle. The automobile was returned approximately one year later and the software was returned on February 6, 1990. While it is undisputed that Zubeldia had a so-called "back-up" tape at his home, there is great debate over the contents of the tape and whether he read or had access to appropriate hardware to read the tape.

9. From 1982 to mid–1987, Zubeldia worked on an hourly basis and kept time sheets reflecting the number of hours worked. By mid–1987, the record keeping stopped and he began working on a 40-hour per week basis.

10. Zubeldia, during his employment had access to the names of Micro Consulting's customers and with Schuelein's consent, he sent a letter dated May 18, 1988, to these customers and advised them that he was no longer employed by Micro Consulting and that Andy Zook would be the person responsible for operating Claimnet and training customers to do the same.

11. Zubeldia set out to create his own electronic claims processing service. The result: Medex. The service was actually formed in April 1988 and incorporated prior to Zubeldia's departure from Micro Consulting. Zubeldia is Medex's president and owns 100% of its stock. Medex's primary purpose is to be a nationwide clearinghouse to process all kinds of insurance claims. Computer hardware was ordered in July 1988 after Zubeldia located an investor to provide financing and Zubeldia thereafter began creating the software for his new service. He entitled his set of programs, "Uniclaim." Uniclaim has over 1100 programs and again includes original as well as licensed programs and those in the public domain.

12. Medex was not functional until November 1988 and then only able to process "paper" claims. It was not until December 1988 that Medex was able to process insurance claims electronically.

13. Clearinghouses that process claims electronically are not unique and they exist nationwide. Some operate intrastate and others interstate. They maintain computer programs that process insurance claims on a claim form known as Form 1500 and thus enable subscribing health care providers to avoid manual preparation and submission of insurance claims. A physician electronically transmits to the clearinghouse all information necessary to complete the Form 1500. The clearinghouse processes the information and generates the insurance claim form. It then forwards the processed claim electronically (or on paper) to the appropriate insurance carrier.

14. Both Uniclaim and Claimnet use the Form 1500 because the very nature of insurance claim processing requires all clearinghouses to do things similarly. They likewise require the same data to process since all insurance companies require the same claim information: patient's name, treating physician's name and diagnosis code. The electronic claim formats are strictly dictated by the insurance industry and each insurance carrier has its own unique way of receiving the electronic claims.

15. At the request of the Court and due to the complex nature of this case, the parties agreed to the appointment of a special master pursuant to Rule 53, F.R.Civ.P. On February 28, 1989, the Court appointed Dr. George E. Hedrick, professor of computer science, Oklahoma State University, Stillwater, Oklahoma. The Court's Order of Reference directed Dr. Hedrick "to determine the copyright issues between the parties [and] to make recommendations to this Court regarding resolution of such copyright issues and ... [m]ore specifically, ... [to] determine whether the defendants have copied or unlawfully used the plaintiff's copyrighted computer program and any supporting materials."

16. Thereafter, on July 28, 1989, the parties agreed further

(1) that the special master shall be the finder of fact in determining whether the defendants copied the plaintiff's computer program;

(2) that the Court shall determine the applicable law and that any disagreement on matters of law shall be resolved by the Court; and

(3) that the parties or the special master may request the Court to instruct the special master on the law which he shall apply to the facts.

17. Dr. Hedrick conducted a hearing during which he heard testimony by Dr. John Fagan, an associate professor of electrical engineering and computer science at the University of Oklahoma, Norman, Oklahoma, and by Zubeldia regarding similarities and differences between Claimnet and Uniclaim. Based upon this testimony and a review of documents and program listings supplied by the parties since such testimony "served in place of ... more rigorous examination of code on [his] part," Dr. Hedrick prepared and presented to the Court his report.[3] Dr. Hedrick found

(a) that both programs serve the same basic purpose;

(b) that Uniclaim is both a derivative and an improvement of Claimnet even though Zubeldia probably did not intend to use Claimnet in any fashion;

(c) that the general underlying structure of Uniclaim appeared to be an expansion of the general underlying structure of Claimnet;

(d) that Zubeldia in an attempt to avoid copying Claimnet, tried to devise a different way to implement the same or similar features in Uniclaim;

(e) that the input is similar in both Claimnet and Uniclaim but that such is to be expected since the input is based upon common claim forms; and

(f) that there is similarity of input and claim format and common use of back-end processors and the Kermit file transfer protocol.

18. Based upon these findings, Dr. Hedrick concluded that

"Uniclaim is neither a line by line nor a verbatim copy, but it is a substantial derivative of Claimnet. Approximately 1/3 of Uniclaim either used standard techniques taught in universities or used codes provided to all users by its owners (e.g., Kermit). Most of the remainder of the Uniclaim system can be attributed to Dr. Zubeldia's prior experience with Claimnet rather than any deliberate intent to misappropriate intellectual property. "Although it is conceivable that Dr. Zubeldia could have developed Uniclaim without his prior experience, I do not believe it would exist in its present form without his knowledge and work with the Claimnet system. My estimate is that at least one third and no more than two thirds of Uniclaim is derived directly from Claimnet."

19. Dr. Fagan, whose deposition was presented at trial, was asked the following questions and gave the following answers:

"Q What is your understanding of the case that we're presently here on today?

---

**3.** As the parties were advised at trial, the Court has accepted Dr. Hedrick's report of January 30, 1990, and thus, the defendants' Motion to Strike Special Master's Report is denied. The plain-tiff's Motion to Confirm Special Master's Report is granted to the extent stated in the Court's Conclusions of Law.

"A  As I understand it, I was asked to come in and look at two pieces of software, both of which file medical claims.

I was asked to look at—determine the similarities between the softwares; look at the way the two pieces of software worked; the capabilities, and that sort of thing; and render an opinion as to whether they were alike or not alike or whether one was a derivative of the other."

Transcript (November 7, 1989) at p. 5, line 25 to p. 6, line 10.

"Q  Could you describe for me how you went about reviewing the software?

"A  Well, ... initially we went through the software and divvied it up into modules."

*Id.* at p. 14, line 22 to p. 15, line 1.

"Q  What was the result of comparing the names on the modules?

"A  It was very poorly—it was unsuccessful, because the structure of the two programs is slightly different—is different.  And so you couldn't find—[the Uniclaim] program has a different structure than does the Claimnet program and so you can't make a comparison between the modules.

. . . .

So you can't compare, you know—you're not going to find two lines of code—you're not going to find ten lines of code here, the same as ten lines of code over here....  It can't be done.

"Q  So would it be your testimony that the codes or the programs are not copied?

"A  What it is, one is not a copy of the other, but I would say one is a substantial derivative of the other probably.  In other words, you're not going to find a—it's not a copy.

"Q  How do you define a substantial derivative?

"A  [T]he Uniclaim program is a logical step forward from the ... Claimnet program.  That is, it's derived out of the—you know, you put together the Claimnet program, okay, and you learn a lot of things from the code, and how you put the things together, and how you do things better.

And then what you do is then you, say, build the next generation....

So what you see is that one comes as a natural evolution of the other one.  If I were writing a piece of software, I would evolve it from one point to the next, but they are not copies of one another, no.

"Q  Are you using a natural evolution synonymous with a substantial derivative?

"A  Yeah, that's a good way to describe it.  It's derived from it.

It's like when I write a piece of software, when you write a piece of software, you do a lot of things—as you're building the piece of software and you're doing all the engineering, and you're cutting and pasting, and you're pushing and punching, you wind up with a piece of functioning software.

And then you way, 'Well, if I could do this all again, this is what I [would] do.'  And so you take all the mistakes you made and all the screw-ups you made, and you say, 'You know, if I were going to do it different today, I would do it this way,' okay.

And that's really what Uniclaim is.  Uniclaim—the Claimnet program is an evolutionary piece of software....

The Uniclaim program is almost an evolution.  It is an evolution of that program....  That's why I called it a derivative or an evolution of the program."

*Id.* at p. 16, line 5 to p. 18, line 19; *see also id.* at p. 58, lines 19–21 ("What I use as a derivation, you know, it's an evolution, it's a derivative which means it logically flows out of the previous.  In other words, it's derived from it.").

"Q  Okay.  Would you define for me what a source code is?

"A  A source code is the code from which the executables are derived.  A source code is the actual language that

the person or persons who is creating the code writes in.

*Id.* at p. 20, lines 20–25.

"Q And did you compare [Uniclaim's and Claimnet's] source codes?

"A Yes.

"Q And what did you determine from that comparison?

. . . .

"A The two codes are built differently. Granted, they work on the same forms, but they are built differently.

One is a derivative of the other, but the source codes are not the same.

"Q In this context, what do you mean by 'one source code is a derivative of the other source code'?

"A One source code is a derivative of the other because you have to have known and looked at and been familiar with the function of one to create the other one.

"Q And why is that?

"A Because they both do outwardly similar things. They do outwardly similar things, except the Uniclaim is substantially enhanced.

It's like any piece of code I've ever written; it's after you decide I'm going to write it over, you learn from all your mistakes; you learn from all that development effort. And when you construct the next one, you don't make those mistakes."

*Id.* at p. 21, lines 11–13, 18–25 to p. 22, line 11.

"Q And when you say that the source codes or the systems outwardly do similar things, ... are you saying that outwardly they both process medical claims?

"A [1500] Forms. They both process [1500] Forms."

*Id.* at p. 22, lines 16–20.

"A [T]he receiving agency has certain specifications that they want for that claim, so both of them have to prepare that claim in a similar manner. That's going to have to be done no matter— it's the same claim going out, and two people may or may not do it the same,

okay, but the output has got to be the same; it's got to look the same.

So when you talk about similarities in the code, they are not similar, okay, but they do the same function.

"Q The end result is the same, but the actual methodology to get there is totally different?

"A Yes."

*Id.* at p. 27, lines 4–14.

"Q Are you aware of any other companies or programmers who have developed electronic medical claims?

"A Uh-huh, yeah. I asked [Zubeldia]— there's a book of essentially electronic claim providers that takes also the [1500] Form and handles it in a similar fashion.

. . . .

"A [T]here are quite a number of people that provide this service."

*Id.* at p. 31, lines 12–16, 21–22.

"Q Okay. Would you define for me with regard to a computer program, what it means as far as sequence of steps in a program or system?

"A It's like this deposition, your list is a sequence of steps, okay.... A program has a sequence of steps, okay. It does—you know, it does one thing, and then does another thing, and then does another thing, and then finally gets finished....

"Q And are the sequence of steps in the Claimnet system different than the sequence of steps—

"A Yes.

"Q —in Uniclaim?

"A. Yes."

*Id.* at p. 34, lines 9–23.

"Q Did you make an evaluation or review to determine the number of programs needed to operate the Uniclaim system as opposed to the Claimnet system?

"A Well, it takes—what do you mean? That's kind of a difficult question, because the tasks are divided up differently....

So when you talk about programs, yes, there's a different set of programs that run in a different set of programs

over here. I mean, they are orchestrated—the tasks are divvied up different."

*Id.* at p. 35, line 24 to p. 36, line 10.

"Q   As a user, could you confuse the Claimnet system with the Uniclaim system as being the same system?

"A   As a user?

"Q   Yes.

"A   I think some of the users that would be using this program probably couldn't tell the difference between Claimnet and G.E. Terminet and [Uniclaim], no. In other words, I can, but the average user may not."

*Id.* at p. 49, lines 16–24.

"Q   In your opinion, is the Uniclaim system a result of all the knowledge, learning and experience of the defendant in this lawsuit?

"A   Yes, it's probably the culmination of all of his learning and experience, yes.

"Q   And is the uniclaim system a result of copying the Claimnet system?

"A   No copies were made. The two pieces of software are not copies of one another. You stand on the base of knowledge that you've learned to date, okay, and all the mistakes you've made...."

*Id.* at p. 52, lines 11–21.

"Q   What percentage, in your opinion, of the Uniclaim system is a derivation of the Claimnet system?

"A   When you speak of direct derivation, I think the whole system is a natural evolution of the Claimnet system; therefore, it is a derivative of it.

In other words, you had to have all the expertise and all the knowledge and everything and you create the new beast, okay. So the whole being is a derivative.

"Q   But to create that new beast, you didn't need the old beast, did you?

"A   No, you don't need the old beast to create a new beast, because G.E. Terminet—G.E. Terminet has got their own beast, and all these other electronic claims people have their own beast.

"Q   Did the defendant, in this case, in your opinion, need specifically the Claimnet system to have produced or have developed the Uniclaim system?

"A   I think having access to the Claimnet or knowing—he's the creator of Claimnet. He created both beasts, okay. He created both beasts, and so it's in his mind. It may not—the code may not be in his mind, but all the methodology is in his mind."

*Id.* at p. 55, line 7 to p. 56, line 4.

20.   The following chart summarizes the testimony of Dr. Fagan and the exhibits admitted into evidence regarding the elements of Claimnet and Uniclaim:

| | Element | Claimnet | Uniclaim |
|---|---|---|---|
| a. | Types of claims processed | Medicare/Medicaid | All types |
| b. | System structure | Static | Dynamic |
| c. | Data Storage | Data base | Flat file |
| d. | Processing steps | Fixed at start-up | Variable |
| e. | Electronic mail pieces | One piece per step | One piece only |
| f. | Electronic mail | Unix | CCITT X.430 |
| g. | Claim identification | Scroll and Synchronize | Paginate |
| h. | Claim validation | Stops at first error | Detects multiple errors |
| i. | User interface | Interactive | Batch |
| j. | Screen displays | Menu oriented | None |
| k. | Claim editor | Screen oriented | None |
| l. | Medicare interface | BSC | SNA/SDLC |
| m. | Medicare throughput | 50 claims/hour | 800 claims/hour |
| n. | Computer hardware | Alspa & IBM–AT | Compaq 386 |
| o. | Number of programs/pages | 321/1271 | 697/2262 |
| p. | Programing language* | C | C |
| q. | Operating language* | Xenix | Xenix |

| Element | Claimnet | Uniclaim |
|---|---|---|
| r. Input format** | HCFA-1500 | HCFA-1500 |
| s. Output format*** | Carrier defined | Carrier defined |
| t. Communication protocols | Kermit*** | Kermit*** |
|  | xmodem*** | 3780/2780 |
|  | Blast* | |

\* Purchased
** See Findings of Fact 12, 13
*** Public domain or free distribution

---

21. On August 25, 1988, a Certificate of Copyright Registration, TXU 333,509, was issued by the United States Register of Copyrights to Micro Consulting. The Certificate contained the following information:

Title of Work: Claimnet System
Name of Author: Micro Consulting [4]
Nature of Authorship: [5] "Entire text of computer program"

### Conclusions of Law

Micro Consulting asserted five causes of action in its amended complaint filed on September 27, 1988, three of which were presented at trial. [6] In Count I, the plaintiff alleged that the defendants' use of Uniclaim violates the Copyright Act, as amended, 17 U.S.C. §§ 101–914. The plaintiff elected statutory damages pursuant to 17 U.S.C. § 504 as its remedy for this cause of action. [7]

In Count II, the plaintiff alleged that the defendants engaged in unfair competition and false description of services under Section 43 of the Lanham Act, 15 U.S.C. § 1125(a). In Count III, the plaintiff alleged a claim for unlawful misappropriation of trade secrets under the Oklahoma Uniform Trade Secrets Act, 78 O.S. §§ 85–94.

Defendant Zubeldia counterclaimed to recover wages in the amount of $25,500.00 allegedly due and owing from his employment with Micro Consulting.

1. Subject matter jurisdiction over the federal causes of action exists under title 28, sections 1338(a) (original and exclusive jurisdiction in cases arising under copyright law) and 1338(b) (original jurisdiction of claims of unfair competition when joined with substantial and related claim under copyright laws) of the United States Code. Pendent jurisdiction over the state law claims and counterclaims arises because a common nucleus of operative fact exists. E.g., United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

2. Venue is proper under title 28, section 1400(a) (suits arising under copyright laws may be instituted in district in which defendant resides or may be found) of the United States Code.

3. Dr. Hedrick's findings must be accepted unless they are clearly erroneous, Rule 53(e)(2), F.R.Civ.P., and the Court hereby accepts the same as evidence (along with all other evidence) of the similarities

---

4. The registration form bears the notation that this was a "work for hire."

5. In this space, the copyright claimant is asked to "[b]riefly describe nature of the material created by this author in which copyright is claimed."

6. In Count IV of its amended complaint, the plaintiff alleged an action for replevin to obtain possession of the 1982 Honda automobile. The vehicle was returned and the plaintiff has not pursued this cause of action. In Count V, the plaintiff alleged a cause of action for tortious interference with business relationships. This cause of action has likewise been abandoned.

7. The defendants have argued that such damages are unavailable should the plaintiff prevail on this claim since Zubeldia commenced work on Uniclaim prior to registration by Micro Consulting of Claimnet on August 25, 1988. The infringement, if any, occurred (and continues to occur) when Uniclaim became operational in December 1988. Thus, registration preceded infringement as required by 17 U.S.C. § 412.

and differences between Claimnet and Uniclaim. Such findings are not clearly erroneous and are supported by the evidence presented to Dr. Hedrick. Application of the law to these findings, acknowledging Dr. Hedrick's recommendations and his reliance on *Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.,* 797 F.2d 1222 (3d Cir.1986), will be done by the Court.

4. Section 501(a) of the Copyright Act provides that

"[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 ... is an infringer of the copyright."

17 U.S.C. § 501(a).

5. Under section 106, the owner of a copyrighted work has the exclusive right

(1) to reproduce the copyrighted work in copies [8] and

(2) to prepare derivative works [9] based upon the copyrighted work.

*Id.* § 106(1), (2).

■ 6. Copyrightable works include "computer data bases, and computer programs [10] to the extent that they incorporate authorship in the programmer's expression of original ideas, as distinguished from the ideas themselves." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 54, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5659, 5667. Legislative history confirms that any protection afforded to computer data bases and computer programs is the same as afforded all categories of work, and no more.

7. This central principle is stated in section 102(b).

"In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

17 U.S.C. § 102(b). Thus, it is "clear that the expression adopted by the programmer is the copyrightable element in a computer program, and that the actual processes or methods embodies in the program are not within the scope of the copyright law." H.R.Rep. No. 1476, at 57, U.S.Code Cong. & Ad.News 1976, p. 5670.

■ 8. To prevail on a claim of infringement under section 501, the plaintiff must prove by a preponderance of the evidence

(1) that it owns a copyrighted work and

(2) that the defendants copied the work.

*Plains Cotton Cooperative Ass'n v. Goodpasture Computer Service, Inc.,* 807 F.2d 1256, 1260 (5th Cir.1987) (citations omitted).

■ 9. It is undisputed that Micro Consulting owns Claimnet. There is however a dispute which arose post-trial as to whether Claimnet, in whole or in part, is copyrighted. This dispute is based primarily upon two arguments advanced by the defendants: (1) the plaintiffs have copyrighted only one of the many programs that constitute Claimnet and (2) if the plaintiff has copyrighted Claimnet as a whole, such is impermissible since Claimnet is comprised of programs already copyrighted by others and programs in the public domain.

10. The plaintiff has the burden of identifying the subject of its copyright and the Court concludes that the plaintiff has met this burden. The Court considers Claimnet to be the "program" identified in Micro Consulting's copyright registration, the en-

---

**8.** Copies are defined as "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term 'copies' includes the material objection, other than a phonorecord, in which the work is first fixed." 17 U.S.C. § 101.

**9.** "A 'derivative work' is a work based upon one or more preexisting works, such as a translation, ... abridgement, condensation, or any oth-

er form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" *Id.*

**10.** "A 'computer program' is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." *Id.*

tire text of which the plaintiff sought to copyright.[11] Indeed, the defendants themselves have referred to Claimnet as a single program throughout their pleadings rather than as a set of individual programs. Thus, the Court rejects the first argument that the plaintiff registered but one of the individual programs.

■ 11. As to the defendants' second argument, the plaintiff admittedly cannot claim ownership of any of the constituent programs that were licensed from others or were adopted from the public domain.[12] The plaintiff can however claim ownership of the elements and features of Claimnet which are original works of authorship within the meaning of the Copyright Act. As stated, any protection afforded by the Copyright Act extends only to these original elements and features to the extent they are expression, not ideas, and it is this core of protectible material that must be compared with Uniclaim to ascertain if there has been a violation under section 501.

12. Thus, having concluded that the plaintiff has proven element one, the Court must now determine whether the plaintiff has likewise proven the second essential element: that the defendants copied Claimnet in creating Uniclaim.

■ 13. Copying may be shown by proof of both access to the copyrighted material and "substantial similarity" between the works. *E.g., Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir.1987) (direct evidence of copying is rarely available; circumstantial evidence of access and substantial similarity of both general ideas and expression is sufficient). Zubeldia was the creator of Claimnet and as such, the Court finds that he had access to it (either through use of the "back-up" tape or because he created it). Thus, only proof of substantial similarity is needed in order for the plaintiff to establish this second element.

14. As one commentator has noted, "the determination of the extent of similarity which will constitute a *substantial* and hence infringing similarity presents one of the most difficult questions in copyright law...." 3 Nimmer on Copyright § 13.03, at 13–23 (1989) [hereinafter Nimmer]. This determination is made even more difficult because as stated, it is only similarity between protectible original expression taken from a preexisting work that is protected and while courts have long struggled with separating idea from expression in more traditional areas, the task is even more daunting in the field of computer software.[13]

15. Various tests have been created to determine similarity of idea and expression between works: the abstractions test, *Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir.1930); the total concept and feel test, *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106 (9th Cir. 1970); the iterative test, *E.F. Johnson Co. v. Uniden Corporation*, 623 F.Supp. 1485 (D.Minn.1985); and the structure, sequence and organization test, *Whelan*, 797 F.2d at 1222.

16. Acknowledging that all tests have been criticized by one or more commenta-

---

11. According to the 1984 Compendium of Copyright Office Practices, the following descriptions of authorship will ordinarily not be questioned: "computer program," "entire program," "entire test," and "text of program." The Compendium also provides that special relief may be granted to an registrant which permits it to deposit less or other than that which is required under general deposit provisions. Such relief is available to computer program applicants when they are unable or unwilling to deposit the usual identifying material in source code format. The Compendium is the manual used by the staff of the Copyright Office. D. Bender, 2 Computer Law App. 4A[18], at 181–98 (1989); *see* 37 C.F.R. § 202.20 (1989).

12. "It is axiomatic that material in the public domain is not protected by copyright, even when incorporated into a copyrighted work." 3 Nimmer on Copyright § 13.03[F][4], at 13–62.37 (1989) (citing *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir.1936), *aff'd*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940)).

13. "Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed ... 'expression.' Decisions must therefore inevitably be *ad hoc*." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960).

tors and courts as inappropriate in the field of computer software, the Court must nevertheless resolve the issue based upon extant case law and in so doing, the Court, for the following reasons, concludes that Uniclaim is not substantially similar to Claimnet within the meaning of the Copyright Act. They are similar in ideas; they are not similar in the expression of those ideas.

17. The plaintiff in its attempt to demonstrate substantial similarity has relied upon the "total concept and feel" test first articulated in *Roth Greeting Cards* and then developed in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir.1977). The United States Court of Appeals for the Ninth Circuit in *Krofft* established a two-part test to determine substantial similarity: an "extrinsic test" to determine similarity in idea and an "intrinsic test" to compare the particular expression used. *Id.* at 1164. It found that while analytic dissection of and expert testimony regarding the objective details of the two works were appropriate for the extrinsic test, the intrinsic test depended "on the response of the ordinary reasonable person" to the works. *Id.* (citations omitted).

18. The second of this two-part test was applied in the context of audiovisual games in *Atari, Inc. v. North American Philips Consumer Electronics Corporation*, 672 F.2d 607 (7th Cir.1982), a case cited and relied upon by the instant plaintiff. In *Atari*, the United States Court of Appeals for the Seventh Circuit stated the test of substantial similarity "is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Id.* at 614 (citing *Krofft*, 562 F.2d at 1164). The Seventh Circuit affirmed that this test "does not involve 'analytic dissection and expert testimony,' but depends on whether the accused work has captured the 'total concept and feel' of the copyrighted work." *Id.* (quoting *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir.1946); *Roth Greeting Cards*, 429 F.2d at 1110).

19. The Seventh Circuit criticized the defendants' offer of a "laundry list" of specific differences and stated that "[t]he *sine qua non* of the ordinary observer test ... is the overall similarities rather than the minute differences between the two works," 672 F.2d at 618 (citations omitted), and that "[w]hen analyzing two works to determine whether they are substantially similar, courts should be careful not to lose sight of the forest for the trees." *Id.* (citation and footnote omitted).

20. In the case-at-bar, the Court finds the same so-called "laundry list" offered by the defendants is significant; it demonstrates (1) that any software designed to process insurance claims electronically using designated forms will have the same "concept and feel" of another, (2) that the overall similarities in protected expression, if any, between Claimnet and Uniclaim are qualitatively insignificant, are to be expected in any program written in C and are dictated by the insurance industry and (3) that the differences in protected expression between Uniclaim and Claimnet are not minute.

21. Furthermore, use of the "total concept and feel" test in the field of computer software has been criticized on the ground that it "is geared toward simplistic works that require only a highly 'intrinsic' (i.e., unanalytic) evaluation[,]" Nimmer § 13.-03[A], at 13–35, and it has been suggested that this test "serves no purpose in the realm of computers where analytic dissection and expert testimony emphatically are needed." *Id.* (footnote omitted).

22. It has been further suggested that "the touchstone of 'total concept and feel' threatens to subvert the very essence of copyright, namely the protection of original *expression*. 'Concepts' are statutorily ineligible for copyright protection; for courts to advert to a work's 'total concept' as the essence of its protectible character seems ill-advised in the extreme. Further, the addition of 'feel' to the judicial inquiry, being a wholly amorphous referent, merely invites an abdication of analysis." *Id.* (footnotes omitted).

23. The plaintiff has also relied on *Whelan*, 797 F.2d at 1222, the case cited by Dr. Hedrick. *Whelan* involved two programs to automate the business aspects of operating a dental laboratory. The two programs performed the same functions, provided similar outputs, and had similar menus, screen displays and input formats for the operators to use. The programs were written in different languages and the parties agreed that there was no literal copying of program code.

24. The United States Court of Appeals for the Third Circuit in *Whelan* rejected the applicability of the ordinary observer test in copyright cases involving exceptionally difficult materials like computer programs and adopted "a single substantial similarity inquiry according to which both lay and expert testimony would be admissible." 797 F.2d at 1233 (citations omitted). The Third Circuit counseled that a court in applying this test "must make a qualitative, not quantitative, judgment about the character of the work as a whole and the importance of the substantially similar portions of the work." *Id.* at 1245 (citations omitted).

25. The Third Circuit also announced a rule for distinguishing idea from expression in computer programs: "the purpose or function of a utilitarian work would be the work's idea, and everything that is not necessary to that purpose or function would be part of the expression of that idea." *Id.* at 1236 (emphasis deleted and citations omitted). In *Whelan*, the purpose or idea of the two programs was to aid in the efficient business operations of dental laboratories and anything more specific, including the programs' nonliteral aspects— structure, sequence and organization—was considered protected expression.

26. Commentators have agreed for the most part that the test in *Whelan* "extend[s] copyright protection too far," Nimmer § 13.03[A], at 13–38, and that the crucial flaw in the rule announced in *Whelan* is that it "assumes that only one 'idea,' in

copyright law terms, underlies any computer program, and that once a separable idea can be identified, everything else must be expression. All computer programs are intended to cause the computer to perform some function. The broad purpose that the program serves, be it managing a dental laboratory ..., is *an* idea. Other elements of the program's structure and design, however, may also constitute ideas for copyright purposes." *Id.* § 13.03[F], at 13–62.28.

■ 27. The Court finds the more appropriate test for use in the case-at-bar is the "abstractions test" articulated by Judge Learned Hand in *Nichols*, 45 F.2d at 119.

> "Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended."

*Id.* at 121 (citations omitted). This method of analyzing a work to determine where the line between idea and expression should be drawn, though created for use with literary works, appears readily adaptable to analyzing computer software.[14] This is so because

> "[c]omputer programmers' authorship is constrained by the limitations of the machines on which their programs are to run and the formalities of the programming language they have chosen. These limitations, combined with the complex task of data management and control flow inherent in computer programming, have lead most programmers to adopt a 'structured' or 'top-down' approach to computer programming. A programmer

14. *See* R. Laurie, "Comment: Use of a 'Levels of Abstraction' Analysis for Computer Programs,"

17 AIPLA Q.J. 232 (1989).

starts with very general ideas of what the program is to accomplish, and moves in steps towards the ultimate goal of producing specific code that can operate the computer correctly.

"In practice, a programmer usually will start with a general description of the function that the program is to perform. Then, a specific outline of the approach to this problem is developed, usually by studying the needs of the end user. Next, the programmer begins to develop the outlines of the program itself, and the data structures and algorithms to be used. At this stage, flowcharts, pseudo-code, and other symbolic representations often are used to help the programmer organize the program's structure. The programmer will then break down the problem into modules or subroutines, each of which addresses a particular element of the overall programming problem, and which itself may be broken down into further modules and subroutines. Finally, the programmer writes specific source code to perform the function of each module or subroutine, as well as to coordinate the interaction between modules or subroutines.

"[T]his process mirrors the analysis used in applying the abstractions test. At the start of the process, the programmer has only a general notion of what the program is supposed to do and possibly which algorithms would be desirable—material which falls within the realm of unprotectible ideas. When the program is completed, the programmer will have produced code which will likely constitute protectible expression. At some point between these extremes, the level of specificity is sufficient to cross the line between idea and expression."

D. Nimmer, R. Bernacchi & G. Frischling, "A Structured Approach to Analyzing the Substantial Similarity of Computer Software in Copyright Infringement Cases," 20 Ariz.St.L.J. 625, 637–38 (1988) [hereinafter A Structured Approach].

28. Thus, at the outset exist the problem and subproblems, the unprotected ideas: abstract entities which do not take into account the details of how the entities are actually realized. The end product is the program: that set of statements or instructions used, directly or indirectly, in the computer in order to bring about the desired result.

29. Between these two points protected expression begins and thus, the Court in employing this "top-down" approach in the case-at-bar, has first identified the problem to be solved by Claimnet and Uniclaim: processing insurance claims electronically. This overall function is accomplished in part by receiving and storing claims from health care providers, identifying, validating and editing those claims and then transmitting the claims to insurance carriers. These components are inherent in the idea of processing insurance claims electronically. They are specific subproblems which were addressed by the programmer, Zubeldia. These quasi-independent parts or modules resulted in specific code so that the subproblems not only were solved but also were fitted together in a specific way so that the overall problem was solved.[15] Details were added; refinement occurred and the Court finds in these circumstances that Claimnet's protected expression begins with these more detailed and refined tasks which are necessary to carry out and solve these subproblems.

30. The Court finds further no substantial similarity between Claimnet and Uniclaim at this level of protected expression. For example, to solve the subproblems of claim identification and claim validation, Claimnet scrolls and synchronizes, stopping at the first error. Uniclaim, on the other hand, paginates and is able to detect multiple errors. Furthermore, the ordering and sequence of these smaller tasks while probably sufficiently unique and creative to qualify as protected expression is different.

31. There is also no dispute that the two source codes while written in the same

---

**15.** The functions of the modules together with each module's relationships to other modules constitute the "structure" of the program.

language were "built differently." The plaintiff however in an effort to show literal similarity between Claimnet and Uniclaim has argued that both have back-end processors and use Kermit file transfer protocols. As Dr. Hedrick noted,

"[t]he fact that both systems use special modules called back-end processors also is reasonable. The concept of using back-end processor is taught in data base courses. These procedures function in place of a hardware back-end.

"The use of the Kermit file transfer protocol also is normal. It is provided for public use by Columbia University. Oklahoma State University is one of the Kermit distribution points. This latter fact has been publicized widely on electronic bulletin boards and in academic institutions."

Dr. Hedrick specifically stated in his report that Uniclaim's use of these should *not* contribute to a finding of infringement. Acknowledging that copied portions may be relatively small in proportion to an entire work, if such are qualitatively insignificant then there is no substantial similarity between the two works. Thus, the Court likewise finds that neither the use of a standard technique nor incorporation of a program in the public domain constitutes similarity sufficient to justify a finding that section 501 has been violated.

32. Accordingly, the Court finds there is no substantial similarity either at the lowest level of abstraction, the literal codes, or at any higher expression level.[16] As stated, the similarity between Claimnet and Uniclaim is similarity of ideas, not expression of those ideas.

33. The plaintiff has advanced additional, but related, arguments: (1) "but for" Claimnet, Uniclaim—the "next genera-

tion"—would not exist and (2) Uniclaim is a "substantial derivation" of Claimnet.

■ 34. As stated, the plaintiff must prove both prongs of the second element: access *and* substantial similarity. *E.g., Krofft,* 562 F.2d at 1172 (no amount of proof of access will suffice to show copying if no similarities). "It is not enough that [the] defendant have access to [the] plaintiff's work and that [the] plaintiff's work serve as a *sine qua non* to the creation of [the] defendant's work. The works still must be 'substantially similar' for liability to ensue." A Structured Approach, 20 Ariz.St.L.J. at 627 n. 6 (citation omitted).[17] Furthermore, originality under the Copyright Act requires neither novelty nor uniqueness. *E.g., Hutchinson Telephone Co. v. Fronteer Directory Co.,* 770 F.2d 128, 131 (8th Cir.1985) (originality does not connote novelty or uniqueness but simply that a work be independently created). To be original, a work need only be created independently by the author, not copied from a preexisting work and as stated, copying is proven by substantial similarity between the two works.

35. The evidence is undisputed that there is deliberate noncopying. The defendants did not merely make superficial changes in the literal and nonliteral aspects of Claimnet to disguise intentional appropriation, *e.g., See v. Durang,* 711 F.2d 141, 142 (9th Cir.1983) ("Copying deleted or so disguised as to be unrecognizable is not copying."); they have legitimately avoided infringement by intentionally making sufficient significant changes in Uniclaim. *E.g., Eden Toys, Inc. v. Marshall Field & Co.,* 675 F.2d 498, 501 (2d Cir.1982) (citations omitted). Zubeldia's experience in creating Claimnet inevitably became part of his expertise. He testified that he did not under-

---

16. No evidence was presented of substantial similarity between the algorithms implemented by these codes or between the definitions and interrelationships of any subroutines, modules or larger functional units.

17. [I]t is not enough to show merely that the defendant used, referred to, was inspired by, or had in mind the plaintiff's work during the creation of the accused work. It must also be shown that the defendant appropriated (by in-

corporation into his own work) more than a de minimis amount of protected expression from the plaintiff's work." *Id.* at 232; *see also* 30 Jurimetrics J. of L., Sci. & Tech. 11, 23–24 (1989) (programmer may examine and study existing programs protected by copyright and base new programs, even competing programs, upon them, provided new programs copy no protectible elements).

take to copy Claimnet and the plaintiff presented no credible evidence which mandates a contrary conclusion.

36. The second argument advanced by the plaintiff is that Uniclaim is a "substantial derivative" of Claimnet. The term under the Copyright Act is "derivative work" and like any other accused work, a derivative work does not infringe unless it has been substantially copied from the preexisting work. *E.g., Vault Corp. v. Quaid Software Ltd.,* 847 F.2d 255, 267 (5th Cir.1988) (to be considered a derivative work, infringing work must incorporate portion of and be substantially similar to copyrighted work); *Litchfield v. Spielberg,* 736 F.2d 1352, 1357 (9th Cir.1984). Thus, substantial similarity is again the key to finding a violation under section 501.

37. The second claim brought by the plaintiff is that the defendants engaged in unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which proscribes false designations of origin and false representations. This statute, as amended by the Trademark Law Revision Act of 1988, provides that

"[a]ny person who, on or in connection with any goods or services, ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities

shall be liable in a civil action by a person who believes that he or she is or is likely to be damaged by such act."

15 U.S.C. § 1125(a). As a remedial statute, it is to be broadly construed to effect its primary propose: to protect the public from confusion; it is not however a catchall

for all alleged unfair business practices or conduct by a competitor.

38. The parties discussed the issues in Count 1 under the Copyright Act at great length and with great attention to detail; little has been said about the Lanham Act. In fact, both parties' brief arguments are grounded on their alleged success under the Copyright Act. While the Court's findings and conclusions as to Count 1 are relevant to Count 2, they are not dispositive.

39. The plaintiff has advanced two theories for finding the defendants liable under this statute: (1) the defendants falsely designated the origin of Uniclaim in that the defendants presented Uniclaim as a product independently created and distinctly different from Claimnet when in fact Uniclaim is but a derivative of Claimnet and (2) the defendants misrepresented to Micro Consulting's customers that Micro Consulting would be unable to survive without Zubeldia and thus, would be unable to provide further services to its customers.

40. To prevail under either theory, the plaintiff must prove by a preponderance of the evidence the following essential elements:

(1) the involvement of goods or services;

(2) an effect on interstate commerce;

(3) a false designation of origin with respect to or a false representation about the goods or services involved; and

(4) a reasonable basis for the belief that it has been injured.

*E.g., Manufacturers Technologies, Inc. v. Cams, Inc.,* 706 F.Supp. 984, 1003 (D.Conn. 1989) (citations omitted).

41. There is no dispute that goods or services are involved in this case and that an alleged impact on sales or goodwill of goods or services in interstate commerce will result in interstate commerce being affected. The key in this case to finding liability under the plaintiff's first theory under the Lanham Act is proof of the third element and such proof requires a showing

of likelihood of confusion among customers and potential customers.

42. Indeed, the critical factual finding this Court must make in resolving the plaintiff's claim for alleged false designation of origin under the Lanham Act is whether the plaintiff has proven "likelihood of confusion." *E.g., Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1220 (2d Cir.1987) (purpose of § 43(a) is to prevent consumer confusion regarding product's source); *Lois Sportsware, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir.1986). This factor is the *sine qua non* of an unfair competition claim based on false designation of origin. The statute does not expressly mandate a finding of confusion; rather, it has been judicially imposed to provide the causal connection between the alleged false description of source and injury in the marketplace.

43. In all circuits, "likelihood of confusion" is determined by analyzing and balancing a number of factors. The list varies from circuit to circuit and in the Tenth Circuit, the factors which must be considered to determining likelihood of confusion are:

(1) the degree of similarity between the two goods or services;

(2) the intent of the defendants;

(3) the relation in use and in manner of marketing between the two goods or services; and

(4) the degree of care to be exercised by customers in purchasing the goods or services.

*Jorache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1484 (10th Cir.1987) (citations omitted).[18]

44. The first factor-degree of similarity between the goods or services—has been addressed under the Copyright Act. As stated, the Court has determined that Uniclaim and Claimnet are similar only in ideas, in use of standard techniques and in

use of public domain and licensed elements; they are not similar in creative expression. Any similarity is outweighed by the differences in the two works.

45. Case law exists to support the proposition that absent substantial similarity, there can be no violation under Section 43(a) for false designation of origin. *E.g., Hartman v. Hallmark Cards, Inc.,* 833 F.2d 117, 121 (8th Cir.1987); *Mihalek Corp. v. Michigan,* 814 F.2d 290, 296 (6th Cir. 1987); *Litchfield,* 736 F.2d at 1358; *Warner Bros. Inc. v. American Broadcasting Companies, Inc.,* 720 F.2d 231, 246 (2d Cir.1983) (absence of substantial similarity leaves little basis for asserting likelihood of confusion); *Cory Van Rijn, Inc. v. California Raisin Advisory Board,* 697 F.Supp. 1136, 1145 (E.D.Cal.1987). Because no one factor is dispositive and all must be evaluated in the context of how each bears on the ultimate issue, the Court opines that the absence of substantial similarity is not a complete answer to the plaintiff's claim for false designation of origin. Accordingly, the Court has considered the remaining factors identified by the Tenth Circuit in *Jordache Enterprises.*

46. The second factor focuses on the defendants' intent; that is to say, did the defendants intend to confuse customers and prospective customers into believing that Uniclaim was derived from Claimnet? As the Tenth Circuit has stated, " '[t]he proper focus is whether [the] defendant[s] had the intent to derive benefit from the reputation or good will of [the] plaintiff.' " 828 F.2d at 1485 (quoting *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 431 (5th Cir.1984)).

47. Zubeldia's letter dated May 18, 1988, to Micro Consulting customers, the defendants' announcement of Uniclaim dated September 23, 1988, and the lack of contrary credible evidence show (1) that Zubeldia advised the plaintiff's customers that he was no longer associated with Micro Consulting and (2) that Uniclaim was

**18.** The plaintiff did not discuss these factors; indeed, the plaintiff failed to address the essential element of "likelihood of confusion" despite the fact that it is the plaintiff which has the burden of proving likelihood of confusion to prevail on a claim under the Lanham Act. *E.g., Jordache Enterprises,* 828 F.2d at 1484.

being promoted as a completely new and different system.

48. The third factor to be considered by the Court is relation in use and manner of marketing. The two works are in direct competition in the same market for the same customers. However, as stated, the evidence presented indicates that Uniclaim was being marketed as a new, more enhanced and efficient program and in a way designed to dissociate itself with existing systems.

49. Admittedly, there is evidence of intent to compete; there is however no evidence of any intent to foster false impressions regarding the origin of the competitive work, Uniclaim and no evidence that customers or potential customers would make *incorrect* mental associations between Uniclaim and Claimnet or between Medex and Micro Consulting.

50. The fact that one work may bring to mind the other does not in itself establish likelihood of confusion as to origin. The law cannot guarantee total absence of confusion in the marketplace; it can only safeguard against unfair competition resulting from such confusion.

51. The fourth factor—degree of care exercised by customers—weighs against any finding of confusion. Health care providers determined to transmit claims electronically to insurance carriers for payment are likely to use a high degree of care in purchasing the hardware and software necessary to perform this task. While these health care providers may not be sophisticated in the field of computer technology, due to the price of the computers and appropriate software and due to the important nature of the tasks the software was designed to accomplish, the Court finds that these customers would be selective in their purchases: the more discerning the buyer, the less likelihood of confusion on the buyer's part.

52. Finally, as the Tenth Circuit has noted, "the best evidence of a likelihood of confusion in the marketplace is actual confusion." *Jordache Enterprises*, 828 F.2d at 1487 (citing *Standard Oil Co.*

*v. Standard Oil Co.,* 252 F.2d 65, 74 (10th Cir.1958)). A plaintiff need not prove actual confusion to prevail—it serves only as additional evidence on the issue. Furthermore, the absence of such evidence does not mandate a finding that confusion is unlikely.

53. The instant plaintiff offered no evidence of actual confusion. It offered only speculation by Dr. Fagan that "some of the users that would be using [a] program probably couldn't tell the difference between Claimnet and G.E. Terminet and [Uniclaim]." Transcript at p. 49, lines 21–23. Confusion, pre- or post-sale, must be probable, not merely possible and the Court concludes based upon the foregoing, that the plaintiff has failed to prove the necessary elements of a violation under Section 43(a) based upon false designation of origin.

54. The second theory advanced by the plaintiff under Section 43(a) is grounded on the defendants' alleged misrepresentations about Micro Consulting's continuing ability to provide services to Claimnet customers. This statute, as stated, prohibits express or implied false representations made in connection with the sale of goods or services.

55. The plaintiff's claim for alleged false representations is akin to a claim based upon false promotion under Section 43(a). In analyzing relevant extant case law, the Court finds that the defendants made no facially false or affirmatively misleading material representations regarding Micro Consulting that did, or were likely to, influence a customer's purchasing decision. Zubeldia's letter of May 18, 1988, to Micro Consulting customers clearly advised that Micro Consulting would be operational after Zubeldia's departure and that it would continue to service Claimnet and train users because Andy Zook, a former Micro Consulting employee, had returned.

56. The plaintiff's final claim seeks relief under the Oklahoma Uniform Trade Secrets Act, 78 O.S. §§ 85–94, for alleged misappropriation of trade secrets. The plaintiff has contended that the defendants used Claimnet to create and implement Uni-

claim and "[s]ince up to two thirds of Uniclaim is directly derived from Claimnet, it follows that Uniclaim embraces and incorporates the trade secrets of Micro Consulting." The plaintiff has not identified particular component parts of Claimnet as trade secrets; rather, it has characterized Claimnet as a whole as the trade secret misappropriated by the defendants.[19]

■ 57. To prevail on this claim, the plaintiff must prove by a preponderance of the evidence

(1) the existence of a trade secret;

(2) misappropriation of this secret by the defendants; and

(3) use of the secret by the defendants to the detriment of the plaintiff.

*E.g., Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.,* 584 F.2d 946, 951 (10th Cir.1978).

58. The term "trade secret" as defined in the Oklahoma Act

"means information including a formula, pattern, compilation, program, device, method, technique or process, that:

a. derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its ... use, and

b. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

78 O.S. § 86(4).

■ 59. The defendants have argued that Claimnet does not qualify as a "trade secret" because it has no economic value and because Micro Consulting failed to maintain its secrecy. Proving the existence of a trade secret requires proof of (1) information not generally known in the industry (2) which gives rise to a competitive advantage to the owner of such information and (3) which is maintained as a secret.

■ 60. Trade secret law clearly applies to computer software and trade secret protection attaches to a broad range of subject matter: computer programs and accompanying documentation as well as the ideas and the expression of those ideas contained therein.

■ 61. Admittedly, the idea of electronic submission of insurance claims to carriers for payment was generally known in the health care and insurance industries. On the other hand, the "information" such as the source code, algorithms and modules and the arrangement of Claimnet's elements, their sequencing and order, which implemented this idea were sufficiently novel and not generally known.

62. Because of this, Micro Consulting derived a competitive advantage through its ownership of Claimnet. Claimnet was equal, if not superior, in quality to other products then on the market.

63. The evidence also demonstrates that Micro Consulting maintained Claimnet as a secret. Secrecy need not be absolute. Micro Consulting took reasonable precautions to insure that the component elements of Claimnet were retained in secrecy and not disclosed. Micro Consulting restricted access to Claimnet's source code, it advised customers as well as potential customers

19. The defendants have argued that this third claim is preempted by federal copyright law. 17 U.S.C. § 301. Copyright law protects against copying of expression but not copying of underlying ideas. Trade secret law prevents unauthorized use of information.

Copyright law does not automatically preempt state laws including state trade secret law. "Attention must be paid in each case to determine what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." 1 Milgrim on Trade Secrets § 2.06A[3], at 2–149 (1990) (footnote omitted).

In *Ehat v. Tanner,* 780 F.2d 876 (10th Cir. 1985), the Tenth Circuit found the plaintiff's

state common law claims for misappropriation of material was preempted by federal copyright law because the circuit court saw "no distinction between such a state right and those exclusive rights encompassed by federal copyright laws." *Id.* at 878 (citations omitted).

In the instant case, it appears that the plaintiff's claim that Uniclaim "is derived" from Claimnet and therefore "embraces and incorporates" the trade secrets of Micro Consulting falls within the scope of copyright law and its protection against copying and thus, is preempted by such law. Nevertheless, the Court has examined the merits of this cause of action.

and licensees of the confidential nature of Claimnet and it required nondisclosure agreements to be executed. Furthermore, Zubeldia himself regarded Claimnet as a secret.

64. Accordingly, the Court finds that the plaintiff has proven the existence of a trade secret.

65. The next element—misappropriation—is defined in Oklahoma as the

"use of a trade secret of another without express of implied consent by a person who ... at the time of the ... use, knew or had reason to know that his knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy or limit is use...."

78 O.S. § 86(2)(b)(2)(b).

66. Proving the existence of this element likewise requires proof of subelements: acquisition by a person who is privileged to the information by reason of some special relationship and unauthorized use of the same.

67. There is no dispute that Zubeldia had access to Claimnet as its author and in his position as president and a director of Micro Consulting. Thus, his knowledge of any secret information at first blush appears to have been "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Id.*

68. In *Amoco Production Co. v. Lindley*, 609 P.2d 733 (Okla.1980), the Oklahoma Supreme Court in determining whether a trade secret existed which gave rise to a duty not to disclose or adopt to one's own use, stated

"that in trade secret litigation, courts are looking at the equities of the given set of circumstances out of which the claimed trade secret arises. The courts are then balancing those equities between the right of the company to use its employees and resources to its utmost advantage against the right of the highly developed mind and skill of the employee. Factors to be considered are how many of the innovative elements in the newly developed process are available in the prior art; how closely tied is the development of the intrinsic knowledge of the innovator. In other words, is it possible to sort the process from the inner workings of a man's knowledge;.... Other considerations are time and money and company facilities used in its production, and the employer's own knowledge thereof."

*Id.* at 745 (citing *Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.*, 401 F.Supp. 1102, 1111 (E.D.Mich.1975) (if subject matter of trade secret is brought into being through initiative of employee in its creation, innovation or development, even though relationship is one of confidence, no duty arises since employee may have interest in subject matter at least equal to his employer or such knowledge is part of the employee's skill and experience)).

69. In balancing the equities in this case, the Court is mindful of the financial resources Micro Consulting made available for the development of Claimnet and of the protection that should be afforded Micro Consulting; the Court must be equally sensitive to the defendants "to insure that [Zubeldia] is not restrained from using his knowledge, skill and experience to gain his likelihood. To the extent that such use does not entail use or threaten disclosure of trade secrets of a former employer ..., authority universally recognizes that one's former employee cannot be restricted from using his knowledge, skill and experience in subsequent employment in competition with his former employee." 1 Milgrim § 5.02[3], at 5–21 (1990). Furthermore, "the mere organization of a corporation in order to compete, although the organization is accomplished prior to [the employee's] termination [from] employment, does not in and of itself, bespeak of misappropriation of trade secrets. *Id.* at 5–29 n. 37 (citations omitted).

70. The Oklahoma Supreme Court is in accord with this majority view and has expressly recognized that "[a]n employee has the right to engage in a competitive business for himself and to compete for the business of customers of his former employer provided such competition is fairly

and legally conducted." *Central Plastics Co. v. Goodson,* 537 P.2d 330, 334 (Okla.1975).

71. To prevail the plaintiff must also prove that the defendants "used" secret information and the Court finds that the plaintiff has not met its burden.

72. As stated, the plaintiff did not identify particular component parts of Claimnet as trade secrets; rather, it characterized Claimnet as a whole as the trade secret used by the defendants and the Court has found that information such as Claimnet's source code, algorithms and modules and its arrangement of elements, their sequence and order, which implemented the idea of electronic submission of insurance claims to carriers for payment, were sufficiently novel to constitute a trade secret.

73. The evidence however is clear that Uniclaim is not a copy of Claimnet and that the source code and structure of Uniclaim are different from the source code and structure of Claimnet. Admittedly, a person may not make use of another's trade secrets; but, a person has the right to use ideas generally known to all and may combine with such general knowledge his own abilities and his knowledge of the customs of the market, the methods of obtaining business and all other factors which affect his particular field and to compete with his former employer.

74. Because the Court finds that the plaintiff has failed to prove wrongful use by the defendants, it has not considered the third element—damages—of the plaintiff's state law cause of action.

75. Also before the Court is the counterclaim of defendant Zubeldia for back wages allegedly due and owing for services performed while employed by the plaintiff.

76. To recover past due wages, Zubeldia must prove each of the following elements of his counterclaim by a preponderance of the evidence:

(1) the performance of services;

(2) the amount agreed upon by Zubeldia and Micro Consulting to compensate for such services; and

(3) nonpayment of this amount by the plaintiff.

77. The Court concludes that Zubeldia has failed to sustain his burden of proof with respect to his counterclaim. It is undisputed that Zubeldia worked at Micro Consulting with the expectation of some compensation from his employer and without doubt, such services were beneficial to Micro Consulting.

78. Zubeldia has failed to prove by preponderance of the evidence the amount of compensation he was to receive. By his own testimony, the amount claimed is only his "best estimate" of the amount allegedly due and owing to him based upon time sheets completed and hours worked under different circumstances.[20] The documents offered by Zubeldia in support of his counterclaim either were unexecuted by the parties and thus, were not indicative of any agreement as to compensation or were prepared by Zubeldia himself when he resigned as president of Micro Consulting.

79. In sum, the Court finds that the plaintiff has failed to prove the essential elements of any of the three causes of action which it pursued at trial and thus, that judgment should be entered in favor of the defendants on these claims. The Court finds further that defendant Zubeldia has failed to prove the essential elements of his counterclaim for back wages and that judgment should therefore be entered in favor of the plaintiff on such counterclaim. Judgment shall issue forthwith in accordance with the Court's findings and conclusions.

## JUDGMENT

This action came on for trial before the Court, The Honorable Lee R. West, District Judge, presiding, and the issues have been

---

20. The Court is mindful that the exact amount of wages need not be shown. It is enough if the evidence is sufficient to enable the factfinder to arrive at a fair and reasonable approximation thereof. *E.g. Blankenship v. Rowntree,* 238 F.2d 500, 503 (10th Cir.1956) (itemized statements not required where compensation expressly fixed and number of days worked could be calculated with reasonable certainty).

duly tried and Findings of Fact and Conclusions of Law have been duly rendered pursuant to Rule 52, F.R.Civ.P., on the claims of the plaintiff, Micro Consulting, Inc., for violation of the Copyright Act, as amended, 17 U.S.C. §§ 101–914, for violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), and for misappropriation of trade secrets under the Oklahoma Uniform Trade Secrets Act, 78 O.S. §§ 85–94, and on the counterclaim for back wages of the defendant/counterclaimant, Pedro Zubeldia.

Based upon the Court's Findings of Fact and Conclusions of Law, it is hereby ORDERED and ADJUDGED that judgment be entered in favor of the defendants, Pedro Zubeldia and Medical Electronic Data Exchange, Inc., and against the plaintiff, Micro Consulting, Inc., on the three claims of the plaintiff so that the plaintiff take nothing by way of its claims.

It is further ORDERED and ADJUDGED that judgment be entered in favor of the plaintiff/counterclaim defendant, Micro Consulting, Inc., and against the defendant/counterclaimant, Pedro Zubeldia, so that the defendant/counterclaimant take nothing by way of his counterclaim.

It is further ORDERED and ADJUDGED that each party bear its own costs of this action.